# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE & CASUALTY COMPANY,**

**Plaintiffs,**

**-vs-** **Case No. 6:06-cv-1757-Orl-GJK**

**PHYSICIANS INJURY CARE CENTER, INC., M.D. IRVING L. COLVIN, ROBERT COLVIN,**

**Defendants.**

---

## ORDER

This cause came on for consideration without oral argument on the following motions:

1. Plaintiffs' Motion to Exclude Opinion Testimony of James Atchison, D.O. and Supporting Memorandum (Doc. No. 398);
2. Plaintiffs' Motion to Exclude the Opinion Testimony of Robert Weatherford and John Sennetti and Supporting Memorandum (Doc. No. 400);
3. Defendants' Motion to Exclude/Strike Report and Expert Opinion of James T. McClave (Doc. No. 402);
4. Defendants' Motion to Exclude/Strike Report and Expert Testimony of Connie G. Coleman (Doc. No. 404);
5. Intervenors' Motion to Strike Report and Preclude Expert Testimony of Connie G. Coleman and Memorandum of Law in Support (Doc. No. 407);
6. Defendants' Motion to Exclude/Strike Report and Expert Testimony of Barry Root, M.D. (Doc. No. 405);

7. Defendants' Motion to Exclude/Strike Reports and Expert Testimony of Richard M. Konsens, M.D. (Doc. No. 406); and
8. Intervenors' Motions to Strike Report and Preclude Expert Testimony of Dana Kaufman, James McClave, Darrell Spell, Barry Root and Richard Konsens (Doc. No. 408) (herein, the "Motion(s)").

## I. <u>BACKGROUND</u>

On November 14, 2006, Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (herein "Plaintiffs" or "State Farm"), instituted this action by filing a Complaint (as amended at Doc. No. 602, the "Amended Complaint") against the Defendants, Physicians Injury Care Center, Inc. ("PICC"), Irving Colvin, M.D. ("Dr. Colvin") and Robert Colvin ("Robert Colvin") (collectively, the "Defendants").[1] The Amended Complaint contains the following counts: 1) Common Law Fraud (Count I); 2) Conspiracy to Defraud (Count II); 3) Unjust Enrichment (Count III); 4) Florida Unfair and Deceptive Trade Practices Act ("FDUTPA") (Count IV); and 5) Declaratory Judgment (Count V). *Id.*

Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on September 5, 2008, the parties filed the aforementioned Motions with respect to James Atchison, D.O. ("Atchison"); Robert Weatherford ("Weatherford"); John Sennetti ("Sennetti"); James T. McClave ("McClave"); Connie G. Coleman ("Coleman"); Barry Root, M.D. ("Root"); and Richard M. Konsens, M.D. ("Konsens").[2]

---

[1] This Court allowed Intervenor Defendants Reidy Williams, Earl Byers, Carmen Berdicia, Marguerite Everidge, Elyse Cottle, Rose Cummings, Jerlean Reed and Andrita King-Fenn (herein, the "Intervenor(s)"), to intervene in this litigation. Doc. Nos. 83, 228, 483.

[2] With respect to Dana Kaufman, McClave, Darrell Spell, Root and Konsens, the Intervenors incorporated in their Motion the Motions filed by Defendants, and Plaintiffs incorporated their respective responses. Defendants' Motions regarding Dana Kaufman and Darrell Spell were previously denied as moot because the Plaintiffs agreed to

**A. Plaintiffs' Expert Witnesses**

1. Coleman's Report

Coleman was retained by the Plaintiffs to provide expert coding and billing opinions regarding this case. Doc. No. 404-2 at 3. She was asked to "evaluate the coding and billing practices for claims submitted by [PICC] and determine if there is evidence to support the insurer's allegations against [PICC]. *Id.* Coleman has worked in the health care field for twenty-six (26) years. *Id.* In 1996, she accepted a position at GEICO as a Utilization Review Nurse and was responsible for the review of bills to identify over-utilization, improper coding, and inappropriate claim submissions and to determine health care billing and coding compliance. *Id.* at 4. In 1999, Coleman became a Certified Professional Coder through the American Academy of Professional Coders. *Id.* In the spring of 2003, she founded Pyramed, Inc. which conducts health care claims audits. *Id.* Since then, Coleman has been retained as an expert in health care claims coding, billing and reimbursement and has provided expert testimony before various Florida state and federal courts. Doc. No. 404-2 at 4-6. She is also a national speaker in the health care anti-fraud area. *Id.* at 6-7.

In her review, Coleman considered the Amended Complaint (a prior version) and the deposition transcripts of Robert Colvin and Dr. Colvin taken in a separate case, and Sara Lynn Basile, Alice Cooley, Dr. Colvin and Robert Colvin taken in this case. Doc. No. 404-2 at 27. She was provided with digital images of the bills and medical records of approximately one thousand (1,000) patients. *Id.* at 9-27. Coleman's report provides the following statements:

> The Florida No Fault statute requires that providers use CPT when submitting healthcare claim for PIP beneficiaries. Claims which fail to comply are

their exclusion. Doc. No. 588. Accordingly, the Court will not discuss the Intervenors' Motion with respect to these two individuals as they are also denied as moot.

> considered noncompensable. Correct coding demands that medical providers use a code that is appropriate for the service being provided, and not a code that is similar but actually represents another service.
>
> . . .
>
> Coding is based solely upon the medical record and is a material factual representation by the physician regarding the medical service or procedure performed and documented in the medical record. The use of a CPT code is a representation that the medical service has been provided in its entirely, including proper documentation of the service; otherwise stated, a medical service has not been completely performed unless the service has been properly documented . . . In order to properly report services rendered the medical record must be accurate, complete, and authenticated by the individual responsible for providing the billable service or procedure.

Doc. No. 404-2 at 28. As far as Coleman's methodology used, she states that data from the claim forms were entered into a database and a Master spreadsheet was created for analysis. *Id.* at 35. "Each patient file was inventoried and dates of service identified across patient files where documentation was not provided." *Id.* "In substantial accord with standards for physician compliance and chart auditing a claims audit was then performed on the line items for which documentation was provided to determine if the documentation provided for each date supported the codes reported." *Id.* Incidental findings were also recorded. *Id.* Coleman provides a list of thirty-one (31) resources she consulted in formulating her analysis. *Id.* at 35-7. She also stated that while her experience does not permit her to interpret law, she utilized a number of Florida codes and statutes as guidance in the application of coding principles. *Id.* at 37-8. Finally, she stated: "In the absence of written criteria, I applied my clinical and professional expertise in the medical and coding professions as more fully discussed above." *Id.* at 38.

Coleman set forth the following significant findings and conclusions in her report:

> [PICC] engaged in practices that were inappropriate, inconsistent with other practices in the industry, and not in accordance with CPT coding guidelines . . .

> based upon my review of the billing and medical documentation provided, [PICC]:
>
> 1. Inflated billings
> 2. Engaged in over-utilization of services
> 3. Billed for professional medical services that were not supported/rendered
> 4. PICC submitted documentation that failed to meet the applicable minimum record keeping standards and submitted false, incomplete and misleading documentation
> 5. Engaged in upcoding
> 6. Engaged in unbundling
>
> In addition . . . it is the Examiner's opinion that there is a reasonable basis to question the documentation, coding and charges associated with these claims.
>
> . . .
>
> By upcoding, unbundling, billing for services not rendered, and billing for services not supported by documentation, the cumulative charges submitted by PICC are inflated and unreasonable . . . The total sum of the charges submitted have been inflated by charges that are noncompensable.
>
> . . .
>
> PICC is reporting services for which supporting documentation is not provided, and in fact, documentation and information provided is indicative that 97110 and 97530 were NOT rendered . . . According to relevant Florida law, it appears that unlicensed personnel are improperly performing physical therapy at PICC.

Doc. No. 404-3 at 1-2, 10. Coleman formulated findings regarding PICC's use of various specific CPT codes. She found, for the most part, that the CPT codes were not properly documented or supported. *See* Doc. No. 404-3 at 9-19. Coleman also found that: 1) PICC submitted documentation that failed to meet the applicable minimum record keeping standards; 2) PICC submitted false, incomplete and misleading documentation; and 3) PICC engaged in upcoding. *Id.* at 20-35.

On March 13, 2008, Defendants deposed Coleman. Doc. No. 404-4. At the deposition, the following transpired:

Q: Is this standard pretty vague as far as when you actually have to comply with? I mean, can you disagree with another coder as to what of these treatises might apply and which ones of them might not apply?

A: Only to the extent of the -- if it was another coder, to the extent of their knowledge in No Fault [herein referred to as the "PIP Statute" or "Florida's No Fault Law"] and their participation, as I was actively -- because I actively participated in the drafting of this legislation and was well aware of the intent, and my experience in 15 years . . . It's possible in their -- with their lack of knowledge we would disagree.

Q: And even as a coding professional, is it true that I could provide you with a medical record and I might be able to provide another coder with your same qualifications a medical record and do the same thing with a third coder, and because there might be a difference of opinion regarding the classification, could you each code it differently perhaps?

A: Depending on the tenure of those coders, their expertise and their knowledge regarding the payer, which different rules apply, depending upon the payer, it is possible that they would have three different opinions, three different opinions.

Q: Because really I mean coding is -- I mean, it is an opinion, right, which code is correct? It's not -- it depends on your view of the -- the documentation, whether or not you feel like it complies with the requirements. I mean, that's an opinion, correct?

A: It's an opinion based on an interpretation.

*Id.* at 5-6. When asked what level of compliance is necessary for the bills to be compensable, Coleman answered absolute, strict compliance. *Id.* at 9. Thereafter Coleman was asked the following:

Q: [Y]ou say, "Coding is based solely upon the medical record and is a material factual representation by the physician regarding the medical service or procedure performed and documented in the medical record." Can you tell me where that statement came from? . . .

A: That's my opinion.

*Id.* Coleman also testified that a coder's mantra is: "if its' not documented, it didn't happen". *Id.* at 12.

Defendants' and Intervenors' Motions

Defendants and Intervenors maintain that Coleman's report consists of "unsupported and contradictory legal opinions and interpretation", and "Coleman improperly interprets Florida law, provides expert legal opinions, applies inappropriate legal standards to the facts of this case, inappropriately provides opinions on medical appropriateness and necessity and opines about the Defendants' subjective intent." Doc. No. 404 at 2; Doc. No. 407. Defendants state that issues of CPT coding are questions of law solely for the trial court's determination. *Id.* (citing *Diblasio v. Progressive Express Ins. Co.*, 14 Fla. L. Weekly Supp. 1027 (Palm Beach County January 9, 2006)). Thus, Defendants and Intervenors argue that Coleman's entire report is an inadmissible legal opinion. Doc. No. 404 at 5; Doc. No. 407 at 12. Furthermore, the Intervenors point out that although Coleman admits she is not an expert on Florida law, each of her opinions attempts to interpret whether Defendants complied with same. Doc. No. 407 at 5. The Intervenors also argue that a large number of cases relied upon by Coleman deal with Medicare regulations and are inapplicable to this case. Doc. No. 407 at 17.

Plaintiffs' Response

On September 19, 2008, Plaintiffs filed a response in opposition to the Defendants' and Intervenors' Motions. Doc. No. 441. Plaintiffs argue that CPT coding is appropriately addressed with expert testimony. *Id.* at 12 (citing *United States v. Diaz*, 2008 WL 906725 (S.D. Fla. March 28, 2008)). Plaintiffs also maintain that Coleman is permissibly applying legal standards to the facts of this case in accord with Federal Rule of Evidence 704(a). Doc. No. 441 at 13. With respect to the sources Coleman relied upon in formulating her report, Plaintiffs maintain that they fall into the category of facts and data contemplated under Fed. R. Civ. P. 703. *Id.* at 15.

Plaintiffs also argue that Coleman does not apply an overly strict interpretation of substantial compliance under the statute. *Id.* at 17. Finally, Plaintiffs state that Coleman should not be barred from referring to "services not rendered" because her opinion "if it was not documented, it did not happen", is entirely appropriate. *Id.* at 19.

2. McClave's Report

McClave and Info Tech were retained by Plaintiffs "to review the sampling methodology of Stephen J. Ratcliff ("Ratcliff") and his associates in this matter." Doc. No. 402-2 at 2. Ratcliff was retained by Plaintiffs to conduct an investigative review and analysis of Defendants' billing records. Doc. 284-2. However, Ratcliff is not listed as a witness in the Joint Pre-Trial Statement (Doc. No. 478) or Plaintiffs' Trial Brief (Doc. No. 582).

McClave was asked to review Ratcliff's sampling methodology and opine as to its statistical reliability. *Id.* McClave's report provides the following with respect to his background and expertise:

> My training and experience is in the science of statistics, which consists of collecting, analyzing, and interpreting data according to well-developed and widely accepted scientific principles.
>
> . . .
>
> I served on the faculties of the State University of Buffalo and the University of Florida for nearly twenty years, teaching statistics and econometrics, which is the application of statistics to business and economic issues, at both the undergraduate and graduate levels.
>
> . . .
>
> I founded Info Tech, Inc., in 1977 . . . a statistical consulting firm, and has expanded into software development and IT network and security solutions. Today Info Tech has 200 employees representing a wide range of professional backgrounds and expertise.

. . .

> Over the past twenty-five years I have been retained to provide an expert opinion regarding statistical issues in hundreds of litigations. I have been retained approximately equally by plaintiffs and defendants, in cases ranging from complex antitrust matters to personal injury calculations. I have been court-qualified as an expert in both statistics and econometrics in federal and state courts throughout the United States.

Doc. No. 402-2 at 1-2. In forming his opinion, McClave reviewed the complaint (prior version); Exhibits A, B, C to the complaint; email correspondence from Ratcliff; Ratcliff's patient list of 1,172 patients and his random selection of 200 patients. *Id.* at 27. McClave does not offer specific methodologies he utilized in forming his analysis.

McClave offered the following opinion:

> The data and materials provided by Mr. Ratcliff indicate that proper procedures were followed to generate a statistically valid random sample . . . In my opinion, the representative sample selected by Ratcliff will provide statistically reliable estimates of total damages to State Farm.

. . .

> In my opinion systematic sampling was particularly appropriate in this case. The 1,172 files in the population covered a rather long period of time, ten years, and were presented in chronological order. The use of a systematic random sample assured that the entire ten year period would be represented in approximately the same proportion as the population . . . As a result, the systematic sample will provide statistically reliable estimates that are free of biases that can be introduced by selecting samples judgmentally rather than probabilistically.

. . .

> The sampling methodology performed by Mr. Ratcliff followed basic requirements to be considered a statistically reliable probability sample. He selected a systematic sample from the population of patients at issue in this case, that is, patients treated by PICC between the years 1996-2007 whose claims were paid by State Farm. His random sample of 200 patients can be considered representative of the total number of patients in the population. In my opinion, State Farm will be able to use this sample to make reliable inferences concerning the entire population of patients.

*Id.* at 4-5.

Defendants' Motion

Defendants maintain that McClave's report is inadmissible "because the population of patients from which Ratcliff generated his sample has changed significantly and the methodology utilized by Ratcliff is unreliable." Doc. No. 402 at 2.[3] Defendants point out that Ratcliff's sampling methodology did not generate a sample of the relevant population, but included patients that are no longer at issue in this litigation. *Id.* at 3-4. Thus, "the sample of 200 does not allow any inferences to be drawn about an entirely different population of patients, covering a different time span." *Id*. at 4. Accordingly, Defendants state that Ratcliff's sample and McClave's opinion are "irrelevant, unreliable and potentially misleading." *Id.* Defendants also maintain that the sample created by Ratcliff was not a systematic random sample because he chose the starting point from which to create the sample. *Id.* at 6. Finally, Defendants argue that because McClave's report omits a reference to reliability and probability, his opinion is misleading. *Id.* at 7.

Plaintiffs' Response

On September 19, 2008, Plaintiffs responded in opposition to Defendants' Motion. Doc. No. 438. Plaintiffs maintain that because the Defendants purportedly engaged in the same conduct throughout the relevant time period, McClave's opinion regarding the validity and methodology of the sampling is reliable. *Id.* at 12. Essentially, "it makes no difference which snapshot of time and/or patients were sampled." *Id.* at 13. Furthermore, Plaintiffs state that health care fraud is routinely shown through a subset of patient records and billing codes. *Id.*

---

[3] Defendants refer to "Kaufman's report" on page 2 of their Motion, which appears to be a typographical error or clerical oversight because McClave's report is clearly the subject of the Motion.

Plaintiffs also state that Ratcliff's selection of a starting point does not invalidate the systematic random sample. *Id.* at 14. Finally, Plaintiffs maintain that McClave's failure to address statistical reliability and error does not affect the probative value of his opinion. *Id.* at 15.

3. Root's Report

Root was retained by Plaintiffs to provide expert opinions and analysis concerning the following:

1. Whether PICC utilized a sham course of medical and therapeutic treatment;

2. Whether the PICC treatment protocol centered around maximizing charges as opposed to providing quality medical treatment of properly diagnosed conditions;

3. Whether the treatments provided by PICC were typically identical regardless of age, injury, patient complaint, diagnosis or examination findings;

4. Whether the medical documentation supporting the treatments performed by PICC adequately substantiates the treatment rendered;

5. Whether the use of the PICC treatment protocol was medically appropriate and medically necessary;

6. Whether the treatments provided by PICC has efficacy and value for the State Farm insureds and their diagnoses;

7. Whether some State Farm insured patients were undertreated by PICC or required further medical evaluation and treatment after being discharged from the PICC program;

8. Whether PICC's treatment of State Farm insureds conformed to fair and reasonable trade practices;

9. Whether the PICC treatment protocol undermines public health policies and objectives for rendition of medical services;

10. Whether PICC has misrepresented that the services it provided to State Farm insured patients were medically necessary and appropriate;

11. Whether PICC has breached a duty that it had to State Farm insured patients to provide individualized care; and

12. Whether the PICC program appears to be a deliberate, willful attempt to perpetuate a fraud or exploit patients and their insurer for financial gain.

Doc. No. 405-2 at 6-7. Root has been a specialist in the field of PM&R for over 21 years and is presently Board Certified. Doc. No. 405-2 at 2. He is the Chairman of the Department of PM&R at Glen Cove Hospital. *Id.* His emphasis is in musculoskeletal and soft tissue injuries. *Id.* He teaches clinical diagnosis and management of patients with musculoskeletal injuries at Cornell University College of Medicine and to the PM&R residents at North Shore LIJ Health Care System. *Id.* Root lists nineteen publications in which he was a contributing author. Doc. No. 405-2 at 3-5.

Root states that he was contact by Plaintiffs in early 2006 to discuss his possible retention. *Id.* at 11. Documents were forwarded for his review, and those documents raised concern as to the medical treatment of PICC patients, so he requested additional files. *Id.* Following receipt of an additional five (5) charts, Root noted additional concerns and prepared an interim report containing provisional conclusions. *Id.* Root indicated that none of the charts reviewed revealed patients having neurological deficits, and almost no medications were prescribed. Doc. No. 405-2. He opined "with a reasonable degree of medical certainty, that almost none of the treatments provided were medically necessary, the billing was excessive and the program was devised for the benefit of the practitioner, not the patients." *Id.* Thereafter, he requested additional charts and drafted a second interim report. *Id.* Based on these reports, he requested that Plaintiffs "consult with a statistician to confirm that any additional charts analyzed would represent a random sampling." *Id.* Root sought to validate his initial findings and conclusions drawn from the previously reviewed charts. Doc. No. 405-2 at 12.

Following these several preliminary reports, Root was forwarded an additional 200 full PICC patient charts for his review. *Id.* at 12-3. His opinions are a result of his review of the 200 charts. *Id.* at 17. In addition, he reviewed the history and physical exams and the associated billing sheets for the remaining 928 available charts. *Id.* at 17-42. Root states: "Through consultation with Mr. [Steven] Ratcliff, I can state with certainty that the conclusions I have reached are based upon a review of all 1252 charts. Outlier charts, that is, all charts identified as not fitting into the PICC protocol were identified and reviewed in detail, thus augmenting the validity of this analysis and stratification." *Id.* at 42. Root also states: I have reached the specific conclusions set forth in this report. My review of the patient files and other data contained therein is in accord with standard methods utilized by all physicians to identify the appropriateness and necessity of care provided to patients." *Id.* at 46.

Root set forth the following opinions in his report:

1. PICC breached its duty to provide the State Farm patients with individualized care;

2. PICC implemented a sham course of treatments, which were virtually identical regardless of patient age, injury, patient complaint, diagnosis or examination findings;

3. The medical documentation by PICC does not adequately substantiate the treatments rendered;

4. The PICC treatment protocol appears to maximize charges rather than provide appropriate and necessary medical treatment for the diagnosed conditions;

5. Some State Farm patients were discharged from the PICC protocol (after incurring substantial medical charges) when documentation indicated that additional medical attention was necessary;

6. PICC's treatment of State Farm insured did not conform to fair and reasonable trade practices;

7. PICC's treatment protocol undermines public health policies and rendition of medical services;

8. PICC has misrepresented itself; the services it provided to State Farm insured patients were neither medically necessary nor appropriate; and

9. The chart of patient Reidy Williams was reviewed, and found to represent a sham course of treatment. My previously stated conclusions are reinforced following the review of this chart.

Doc. No. 405-2. In summary, Root stated the following:

> Based on the foregoing, I conclude that there is sufficient evidence to warrant a finding that the PICC has engaged in the fraudulent practice of medicine. I also opine that PICC misrepresented itself to the STATE FARM insured patients it treated as well as to the STATE FARM. It is my opinion that the fraudulent medical treatment observed in this case was performed in a willful and intentional manner, with the goal of enriching PICC, Dr. Irving Colvin and Robert Colvin, without regard to the patients [sic] best interests. . .

Doc. No. 405-2 at 64. On March 10, 2008, Defendants deposed Root. Doc. No. 405-3. Root testified that ten percent (10%) of his practice is related to Florida's No Fault Law injuries, but less than that is actually treating people post a motor vehicle accident with a spinal issue. *Id.* at 4. Root also testified in formulating his opinion that recovery from soft tissue injuries usually occurs within four to six weeks, the literature he reviewed did not involve post motor vehicle accident injuries. *Id.* at 6. Thereafter, he stated: "The mechanism of injury of a soft tissue injury if, in fact, the patients have sprain and strains I don't believe would be dramatically different because of them being in an accident or not in an accident in a motor vehicle." *Id.* at 7.

<u>Defendants' and Intervenors' Motion</u>

Defendants seek to strike Root's expert report due to the following: 1) Root is not qualified to render opinions about the medical treatment provided because he is not a licensed Florida physician; 2) Root is not qualified by training, experience or expertise to render legal conclusions or to apply the facts of this case to the applicable law; 3) Root lacks training,

experience or expertise to render opinions about the motivations of the Defendants; and 4) Root's opinions are based, in part, on an unreliable and irrelevant statistical sample. Doc. No. 405 at 3. Defendants also maintain that Root's testimony is cumulative of the testimony of Konsens, who was retained by Plaintiffs to address the same or similar issues. *Id.* at 4.

Plaintiffs' Response

On September 19, 2008, Plaintiffs responded in opposition to Defendants' Motion. Doc. No. 439. Plaintiffs maintain that Root is qualified to testify about PICC's treatment protocol. *Id.* at 11. Plaintiffs state that he is a board-certified physiatrist who treats patients suffering from neck and back sprains and strains. *Id.* Plaintiffs emphasize that Root presently works and teaches in hospitals, maintains a private practice, and has published a number of articles in his field. *Id.* Furthermore, Plaintiffs maintain that Root's testimony does not include inadmissible legal opinions or improper application of legal standards to the facts of this case. *Id.* at 15. Plaintiffs state that Root bases his opinion on a proper statistical sample. *Id.* at 16. Plaintiffs also state that Root can testify as to a lack of medical reasons to validate the protocol. *Id.* at 19. Finally, Plaintiffs maintain that Root's report is not cumulative of Konsens. *Id.* at 20.

4. Konsens' Report

Konsens was retained by Plaintiffs to provide an opinion on the following issues involving record keeping practices of the Defendants:

1. Whether PICC submitted to State Farm incomplete medical records;
2. Whether PICC failed to meet the minimal record keeping standards for medical doctors, physical therapists, licensed massage therapists;
3. Whether PICC's treatments performed were reasonable and medically necessary;

4. Whether PICC's practice of failing to keep a record of which health care professional actually rendered medical treatment is in violation of Florida record keeping standards;

5. Whether PICC's record keeping conduct was deceptive and deviated from the standards for fairness or reasonableness in medical record keeping in the medical profession;

6. Whether PICC's record keeping conduct offends and undermines the public policy underlying the Florida record keeping standards;

7. Whether PICC's conduct constitutes a violation of the disciplinary standards of the medical licensing chapters;

8. Whether PICC had a duty under Florida record keeping standards to keep accurate and complete medical records for the services rendered; and

9. Whether PICC breached its duty through its conduct as referenced in Plaintiffs' complaint.

Doc. No. 406-2 at 2. Konsens is a board certified orthopaedic surgeon and has practiced in the Jewitt Orthopaedic Clinic in Winter Park, Florida since 1989. *Id.* He has been a member of the American Academy of Orthopaedic Surgery since 1992. *Id.* Konsens has been the Chairman of the Department of Orthopaedics at Winter Park Hospital for the past eighteen years, and he has served as a special expert witness for the State of Florida for approximately twelve years. *Id.* He has written fifteen published articles in Orthopaedic journals and has published two articles on fraud and abuse in medical practices. *Id.* Konsens report includes a list of depositions he has given from 2004 through 2007, and he identified nine cases over the past four years in which he has been deposed as an expert witness. Doc. No. 406-2.

Konsens was initially provided ten files containing medical records and treatment notes, which he reviewed and informed Plaintiffs of his initial impressions. *Id.* at 3. Konsens was then provided a set of records from PICC of 200 files on various PICC patients, which included

treatment notes, medical records and billing records. *Id.* As he reviewed the 200 files, he made notes as to patterns and similarities within the files. Id. at 4. Thereafter, he considered 800 patients files wherein he noted similarities in regard to the diagnoses and "unusual" similarities of treatment plans – "almost everyone was ordered a course of physical therapy while the more standard treatment plans were not considered." *Id.* Konsens noted a few outliers, either the files that included an additional diagnosis or PICC did not recommend physical therapy. Konsens maintained that they were the exceptions but they "still exhibited the protocol type record keeping which was observed with the other patients." *Id.*

In his report, Konsens makes the following conclusions:

> In this expert's opinion, PICC submitted to State Farm incomplete medical records . . . There is an obvious pattern of record keeping and documentation that included such gross similarities that obviously detract from appropriate, individualized patient care . . . It is my opinion based on my orthopaedic knowledge and 20 years of clinical experience, that it would be virtually impossible for 200 patients to be involved in different motor vehicle accidents and all have virtually the same exact diagnoses.
>
> . . .
>
> PICC failed to meet the minimal record keeping standards for physical therapists . . . there is virtually no chart in which the therapist has signed the record. This again is a clear violation of the minimum record keeping standards . . . Although some of the notes are signed by Dr. Colvin, it is highly unlikely that Dr. Colvin in fact provided the treatment himself, and the names of the physician extenders should have been accurately documented.
>
> . . .
>
> Another recordkeeping practice of PICC which violates the Florida recordkeeping standards includes X-ray evaluation . . . An appropriate X-ray report would include the specific views that were obtained . . . In the 200 files I reviewed, there was virtually never any documentation of the X-ray views that were specifically obtained, why they were obtained, the quality of the X-rays, and the pertinent positives and negatives . . . This is a clear violation of the minimum record keeping statute.

. . .

> The follow up/progress notes would also be considered very cursory and incomplete. In almost all cases the chart states that the patient was having continued pain. In virtually none of the cases are any of the red flags or warning signs that were previously discussed documented . . . These progress notes, in summary, also strongly suggest patterned, predetermined and formulitic [sic] treatment that detracts from the appropriate and individualized patient care and falls below the standards for adequacy of medical records.
>
> In sum, the record keeping practices of PICC constitutes a deviation from the minimal record keeping standards mandated by both state statute and the Florida Department of Professional Regulation. The obvious public policy goals of adequate treatment documentation and patient care are offended, if not thwarted by PICC's conduct in this regard. This constitutes a clear breach of PICC's duty to State Farm, as well as to its patients.

Doc. No. 406-2 at 4-6. Konsens supplemented his report after reviewing additional medical records and deposition testimony, and his conclusions made therein were consistent with the conclusions addressed above. Doc. No. 406-3. On February 27, 2008, Konsens was deposed by the Defendants. Doc. No. 406-4. Konsens testified that ten to fifteen percent of his patients suffer neck and back sprains or strains and twenty-five percent of those patients' injuries result from a motor vehicle accident. *Id.* at 3. He indicated that he has prescribed physical therapy, ultrasounds and electrical stimulation for patients with those specific injuries. *Id.* at 5. Konsens, who considers himself as a specialist in knee injuries, stated that he does not limit his treatment to the knee but his work with neck and back injuries has decreased. *Id.* at 10-11. Konsens also stated that he considers himself an expert on fraud abuse in medicine. Doc. No. 406-4 at 12.

<u>Defendants' and Intervenors' Motion</u>

The Defendants and Intervenors request that this Court strike Konsens' expert report and testimony. Doc. Nos. 406, 408. They argue that Konsens is not qualified or competent to testify as to the issues he addressed in his report and during his deposition. Doc. No. 406 at 3. They

state he is not an expert on medical record-keeping or in treating patients with post-motor vehicle accident neck and back sprains and strains and that his testimony consists of speculation and inadmissible legal conclusions. Doc. No. 406. The Defendants and Intervenors also argue that his testimony is not reliable because his opinions are based on his own beliefs and speculation as opposed to methods and procedures. *Id.* Finally, they state that Konsens' report and testimony will not assist the jury because he failed to conduct an individual analysis of each insured's claims. *Id.*

<u>Plaintiffs' Response</u>

On September 19, 2008, Plaintiffs responded in opposition to Defendants' and Intervenors' Motion. Doc. No. 440. Plaintiffs state that Konsens is qualified to testify about medical record-keeping and his opinions are not inadmissible legal conclusions. *Id.* Plaintiffs maintain that doctors "routinely" provide expert analysis regarding proper medical record keeping standards. *Id.* at 11. Plaintiffs also maintain that Konsens is qualified to testify about the Defendants' treatment protocol considering he has eighteen years experience of treating patients with neck and back sprains and strains who were involved in a motor vehicle accident. *Id.* Finally, Plaintiffs state that Konsens testimony is reliable. *Id.* at 17. According to Plaintiffs, Konsens review of the Defendants' records and his conclusions are based on his education, training, experience and relevant literature. *Id.* Furthermore, Plaintiffs state that the Defendants mischaracterized Konsens' testimony regarding his opinion on whether the treatments were medically appropriate. *Id.* at 18.

**B. Defendants' Expert Witnesses**

1. Atchison's Report

Atchison was retained by the Defendants "to provide expert opinions and analysis regarding the [Amended] [C]omplaint . . ." Doc. No. 398-2 at 2. PICC specifically requested that Atchison address the conclusions of Root. *Id.* Atchison submitted his report on February 29, 2008. *Id.* at 1. Atchison is a board certified specialist Physical Medicine and Rehabilitation ("PM&R") and has been practicing in academic medical centers for the past 17 years. *Id.* Atchison is an osteopathic physician trained in manual and holistic medicine and is the Chief of the Division of PM&R at the University of Florida Health Science Center. *Id.* He has a subspecialty board certification in Pain from the American Board of Physical Medicine and Rehabilitation. *Id.* at 3. Atchison lists 19 publications that he authored in whole or in part. Doc. No. 398-2 at 3-5.

Atchison reviewed the Amended Complaint, Root's report, five anonymous files, standardized paperwork for patient intake, management and education for PICC, and he met with Robert Colvin and Dr. Colvin to review the pattern and practices of PICC. *Id.* He also consulted various articles. *Id.* at 6-7. Atchison states that he has never previously testified as an expert witness. *Id.* at 21. He does not provide specifically any methodologies he utilized in forming his opinion.

Atchison reviewed the following conclusions made by Root in his report:

1. Based upon my review of the documentations and data provided, PICC breached its duty to provide the STATE FARM patients with individualized care.

2. PICC implemented a sham course of treatments which were virtually identical regardless of patient age, injury, patient complaint, diagnosis, or examination finings.

3. The medical documentation by PICC does not adequately substantiate the treatments rendered.

4. The PICC treatment protocol appears to maximize charges rather than provide appropriate necessary medical management for the diagnosed conditions.

5. Some STATE FARM patients were discharged from the PICC protocol (after incurring substantial medical charges) when documentation indicated that additional medical attention was necessary.

6. PICC's treatment of STATE FARM insured did not conform to fair and reasonable trade practices.

7. PICC's treatment protocol undermines public health policies and rendition of medical services.

8. PICC has misrepresented itself; the services it provided to STATE FARM insured patients were neither medically necessary nor appropriate.

9. The chart of patient (____) was reviewed and found to represent a sham course of treatment. My previously stated conclusions are reinforced following the review of this chart.

*See, generally,* Doc. No. 398-2. Atchison makes the following conclusions with respect to the statements of Root:

> Upon review of the information from the PICC practice . . . and through a review of the office practices with Mr. Colvin and Dr. Colvin, it is my opinion and impression that the practice provides a standardized pattern of care for individuals who meet the inclusion criteria to the practice and provide subtle modifications within the treatment protocol as indicated **by the five charts I reviewed**.
>
> . . .
>
> [I]t is apparent that the office attempts to acquire all medical information regarding each patient, attempts to acquire the medical information from any prior evaluation or treatment for this injury that has occurred prior to the visit, performs a physical examination. And provides recommendations for individualized treatment plans to go in association with the protocol for standard therapy . . . care which is the centerpiece of rehabilitation in this practice.
>
> . . .

> In further review of the charts provided, there is without question an emphasis on the physical modalities and rehabilitation of the patient . . . However, variability is noted within these charts . . . This would be a highly accepted pattern of care and treatment.
>
> . . .
>
> The medical literature would certainly not agree with [Root's] assessment [that "These are minor soft tissue injuries which are known to spontaneously improve over four to six weeks with or without continuous medical re-evaluation."]. . . Unfortunately, after injury from a car accident, the course of recovery is quite different and slower than with other spine injuries.
>
> . . .
>
> After reviewing the PICC charts . . . and discussing the office protocols of Dr. Colvin, it is apparent that a thorough history and physical examination is performed on the first visit to assess the appropriateness of the patient in participating in PICC's standardized protocol.
>
> . . .
>
> I would comment that the issues in regards to a practice using a protocol to direct treatment is becoming an extremely accepted practice within medicine and, in fact, is encouraged in most areas nowadays to provide consistent pattern of care. In fact, most hospitals are directing physicians to proceed in this manner.
>
> . . .
>
> Therefore, the evidence neither supports nor refutes the effectiveness of either passive or active treatments to relieve the symptoms of Whiplash-Associated Disorders, grade -1 or -2. These are exactly the patients that Dr. Colvin and the PICC physicians were dealing with in attempting to provide structured care for their improvement and support, and the standardized treatment protocol is their attempt to synthesize and combine the results of medical research into a useful clinical regimen.

*See, generally,* Doc. No. 398-2 (emphasis added). On March 14, 2008, Atchison was deposed by the Plaintiffs. Doc. No. 398-3. Atchison stated that he reviewed the five files provided by the Defendants for about two (2) hours. *Id.* at 5, 14. He stated that he spent three (3) hours with Dr.

Colvin going over the treatment he renders at PICC. *Id.* at 7-8. When asked if he knew whether the charts he reviewed were complete, he stated that he did not know. *Id.* at 8. Atchison maintained that he is sufficiently informed to testify under oath as to his opinions of Defendants. *Id.* at 8-12.

Plaintiffs' Motion

Plaintiffs filed their Motion with respect to Atchison stating that the "Defendants cannot carry their burden of establishing qualification, reliability, and helpfulness with respect to Dr. Atchison." Doc. No. 398 at 5. Plaintiffs maintain that Atchison's opinions are unreliable because he reviewed an insufficient sample of patient files and his opinions are based on inaccurate data. *Id.* at 6. Plaintiffs also argue that Atchison's testimony is hearsay because he merely repeated the "self-serving" statements of Defendants. *Id.* at 9.

Defendants' Response

On September 19, 2008, Defendants responded in opposition to Plaintiffs' Motion. Doc. No. 433. Defendants maintain that Plaintiffs' Motion "grossly mischaracterizes the scope and substance" of Atchison's expert testimony because Atchison was retained solely to render an expert opinion regarding Root's conclusions in his report. *Id.* at 2. Thus, Defendants maintain that Plaintiffs' argument regarding the use of an improper sample misrepresents the scope of Atchison's expert opinion. *Id.* at 8. Furthermore, Defendants state that Atchison's testimony is not hearsay.

2. Sennetti's Report

Sennetti was retained by PICC to provide an expert opinion as to "whether the conclusions reached by the report of Ms. Connie G. Coleman . . . can be supported." Doc. No.

400-2 at 1. Sennetti has been a professor of Graduate Statistics and Accounting at the Huizenga Graduate School of Business and Entrepreneurship, Nova Southeastern University since 1996. Doc. No. 400-2 at 2. Sennetti is a certified public accountant licensed by the state of Texas and has a doctorate decree in mathematical statistics from the Virginia Polytechnic Institute and State University. *Id.* He has previously served as an expert witness as a statistician and an auditing professor specializing in sampling to identify fraud in transactions such as Medicare payments. *Id.* He has also served as an expert or consultant in thirty other Medicare investigations and has appeared before ten different Administrative Law Judges. *Id.* He has been accepted as a qualified expert with respect to statistics and auditing by those judges regarding statistical sampling, and he has authored publications on both of these fields. *Id.* In forming his opinion, Sennetti reviewed Coleman's report along with a few statistical and auditing references. *Id.* at 3. While Sennetti challenges the methodology used by Coleman, he does not specifically provide his own methodology.

Sennetti expressed the following opinion:

> I find the statements made for all claims submitted by PICC to State Farm in the Coleman Report invalid because they are not supported by the information provided. The Coleman Report makes statements that go beyond the evidence. While the Coleman Report makes claims that incorrect coding is 'frequently applied,' it does not give actual frequencies. The Coleman Report 'finds the practices demonstrated by PICC and the manifestation of their scheme to be unfair, deceptive and unconscionable.' Yet, the Coleman Report does not examine the practices of PICC. Instead, it examines just subsets of those practices and these are not randomly sampled, but rather, they are just 'provided' to the expert. As a statistician I find this evidence not scientifically valid, and as a professor of auditing and a CPA, I find what it presents as auditing evidence not valid.

*Id.* at 2. On March 7, 2008, Plaintiffs' counsel deposed Sennetti. Doc. No. 400-3. Sennetti was asked a number of questions which were outside his scope of retention, including the following:

Q: Have you ever analyzed a medical provider's pattern of use of a given CPT code or a number of CPT codes?
A: No, that's not my field. I don't do that.
Q: Have you ever worked to analyze the conclusions of a coding professional – a medical coding professional?
A: Coding is not my field.
Q: If a medical provider uses one code to describe a range of services over a period of time, does that, in your experience, constitute an indicator of fraud or abuse?
A: I have no idea. I can't -- I don't know that.
Q: Have you ever been asked to give an opinion as to, from a statistical viewpoint, any use of a given code may be an indicator of fraud or abuse in any circumstance?
A: I have not, no.

Doc. No. 400-3. Sennetti testified: "If [Coleman] said, I viewed all claims in every case the CPT code was violated, I would not object to that." *Id.* at 11. Sennetti's statement is based on his contention that Coleman's "statements made on all claims are not appropriate because [she] did not review all claims." *Id.* at 10.

<u>Plaintiffs' Motion</u>

Plaintiffs argue that Sennetti is not qualified as an expert witness for a number of reasons. Doc. No. 400. Sennetti has never been qualified as an expert in federal or state court, and he does not have any experience with Florida's personal injury protection statute ("PIP Statute"). *Id.* at 2. Moreover, because Sennetti has only reviewed Coleman's original report, not her supplement report wherein she purportedly finished analyzing all of the patients' claims, Plaintiffs' claim his report is no longer relevant. *Id.* at 2-3.

<u>Defendants' Response</u>

On September 19, 2008, Defendants responded in opposition to Plaintiffs' Motion. Doc. No. 433. Defendants maintain that Coleman's report is still deficient because her supplemental report did not include a review of each and every claim at issue in this lawsuit. *Id.* at 6. Thus, the

Defendants maintain that Sennetti's expert testimony is still relevant to Coleman's supplemental report. *Id.* Defendants also state that Sennetti's expert opinion is relevant to the expert testimony of McClave, Root and Konsens, and PICC requests leave to allow Sennetti's report to be utilized for the purpose of challenging their expert opinions as well. *Id.* at 8.

3. Weatherford's Report

Weatherford was retained by Intervenors and Defendants to render a written opinion of Coleman's expert report. Doc. No. 400-4. Weatherford submitted his expert report on February 23, 2008. *Id.* Weatherford is a Certified Professional Coder ("CPC") from the American Academy of Professional Coders. Doc. No. 400-4 at 5. He has authored, in part, three publications. *Id.* at 6. Weatherford has been retained as an expert more than sixty (60) times. *Id.* at 6-15. In thirty (30) of those case, he was qualified as an expert witness and testified, in the most part, regarding Medicare billing and coding. *Id.* Weatherford did not specify what methodologies he used in forming his opinion. Weatherford stated:

> In my opinion it is inappropriate for an unbiased claims reviewer to be provided the insurer's allegations of inappropriate billing. A [CPC] has the education, training and experience to analyze billing data and associated medical records and formulate a valid opinion as to whether the services were coded appropriately and the published guidelines were met or exceeded. Furthermore, there is oftentimes a tendency for the reviewer to tailor to the report to meet the expectations of the entity who has requested the analysis.
>
> . . .
>
> Clearly [Coleman's] focus is to serve the insurance industry and her opinions throughout this report are indicative of an unhealthy anti-provider bias.

*Id.* at 4. Weatherford opined that very few of the thirty-one (31) resources identified and relied upon by Coleman have any relevance on the services billed to State Farm. *Id.* at 15. Weatherford made the following finding:

> It is my opinion that Ms. Coleman's Expert Report should be totally disregarded based on a number of factors which have diminished her credibility and magnified her lack of objectivity and fair mindedness. It is patently obvious Ms. Coleman's focus was clearly on rendering a decision which met the expectations and desires of the plaintiff who has engaged her services rather than providing an unbiased opinion of the facts contained within the documentation. In eighteen years of billing and coding consulting, I would characterize this as the worst 'hatchet job' and display of total disregard of the ethics and professionalism expected of a [CPC] that I have reviewed.

Doc. No. 400-4 at 34. On March 13, 2008, Weatherford was deposed by Plaintiffs' counsel. Doc. No. 400-3 at 13-32. Weatherford testified that he has never been retained by Medicare, Medicaid or a private insurer to investigate or review a provider's billing practices. *Id.* at 14. He also stated that having reviewed the PIP Statute two or three years ago and within the past couple of weeks, he considers himself an expert in medical provider's billing under the PIP Statute. *Id.* at 16. Thereafter, when asked if he had read every page of Florida Statutes Sections 627.732 and 627.736[4], he stated: "I have really not had the time [to] totally digest it. I was brought in the last minute on this case, and I focused my energy on the report." *Id.* at 17. The following dialogue took place at the deposition:

> Q: Did you ever make the statement that it may not be in PICC's best interest for you to review their bills and medical records?
> A: One time I did, yes.
> Q: And why did you say that?
> A: Because of just the fact that then I would be reviewing the records for the other side.
> Q: What do you mean, reviewing the records for the other side?
> A: I would be doing the same thing Ms. Coleman did. I would be reviewing those records.
> Q: And why would that not be in PICC's best interest?
> A: I don't know without looking at them.
> Q: And is that because you may end up having the same opinion as Ms. Coleman?
> A: No. It just means I haven't reviewed them . . . I don't know without seeing them.

[4] Florida Statutes Sections 627.732 and 627.736 address Florida's No Fault Law (the PIP Statute) and define terms set forth therein.

Q: It may be that your opinion would be that PICC's coding and billing practices were inappropriate.
A: I don't know.
Q: It's a possibility. Right?
A: Sure. It's a possibility.
Q: But you haven't reviewed any bills or medical records from PICC?
A: No.

Doc. No. 400-3 at 22. Weatherford stated that without having reviewed PICC's records, he would not be able to determine the appropriateness of Coleman's level of review. *Id.* at 28. Weatherford also testified that there are no official guidelines for reviewing another coder's work, and his opinion was based on his experience. *Id.* at 23. He agreed that there may be more than one appropriate method of reviewing a medical provider's bills and documentation. *Id.* at 25. Weatherford stated the following at the deposition:

Q: So when you say you reviewed 360 patients, you only reviewed a single date of service for 360 patients?
A: In that particular case, yes.
Q: Are you aware that Ms. Coleman reviewed every date of service for these patients?
A: No, I am not.
Q: If she had a spreadsheet that was 3,000 pages long, that would certainly document what she did, wouldn't it?
A: If she had all the elements in there, yes.
Q: What elements are you referring to?
A: Well, again, what codes she reviewed, what she found from that particular code.
Q: Okay. You would agree that it wouldn't be practical to attach to a report, would it?
A: It could be done, yes.
Q: It's certainly appropriate to use that as her supporting documentation. Right?
A: If you are going to provide the written report to me, you are also going to provide the supporting documentation for it.
Q: But again, there is no methodology standard that requires that, is there?
A: No.
Q: So that's your opinion. Right?
A: That's my opinion.

*Id.* at 31-2. In his report, Weatherford states: "The opinions expressed in my evaluation of Ms. Coleman's report are based on the American Medical Association's Current Procedural Terminology (CPT 1996 through 2007), various companion American Medical Association publications and the 1995 and 1997 Evaluation and Management Code Documentation Guidelines which were developed by the American Medical Association and the Health Care Financing Administration." Doc. No. 400-4 at 19.

Plaintiffs' Motion

Plaintiffs maintain that Weatherford should not be permitted to testify as an expert for the following reasons:

1. Weatherford did not review a single bill or medical record relating to this case;
2. Weatherford was unaware of and unable to provide any acceptable methodology for reviewing a medical provider's bills and records; and
3. Weatherford admitted that there are no guidelines or methodology that he followed in reviewing Coleman's report.

Doc. No. 400 at 11. Plaintiffs also state that Weatherford's report amounts to nothing more than a personal attack on Coleman. *Id.* at 10. Plaintiffs argue that his opinion should be stricken under *Daubert* because it is "an unsupported, bias-riddled opinion" which could confuse and mislead the jury. *Id.* at 11. Thus, Plaintiffs request that he be excluded as an expert witness at trial. *Id.*

Defendants' Response

On September 19, 2008, Defendants filed a response in opposition to Plaintiffs' Motion as to Weatherford. Doc. No. 433. Defendants argue that Plaintiffs mischaracterize the scope of

Weatherford's expert opinion considering he was not hired to review PICC's billing practices, but rather was retained to provide an expert opinion on Coleman's report. *Id.* at 9. Defendants maintain that Weatherford's inability to provide an authoritative source as to proper coding has no bearing on the reliability of his opinion. *Id.* at 10. Furthermore, Defendants state that Weatherford relied on several authoritative sources in formulating his opinion. *Id.* at 11. Thus, Defendants maintain that Weatherford's testimony is relevant and appropriate in evaluating Coleman's report. *Id.* at 13.

## II. THE LAW

Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id.* In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the trial court must perform a "gatekeeper" function designed to ensure that any and all expert testimony is both relevant and reliable. "The burden of laying a proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of America*, 367 F.3d 1255, 1261 (11th Cir. 2004). The party offering the expert has "the burden to show that his expert [is] 'qualified to testify competently regarding the matters he intend[s] to address; [] the methodology by which the expert reache[d] his conclusions is sufficiently reliable; and [] the testimony assists the trier of

fact.'" *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)).

In *Daubert*, the Supreme Court identified the following non-exclusive list of factors a court should consider when determining the admissibility and reliability of expert testimony:

1) whether the expert's methods or techniques can be or have been tested;
2) whether the technique, method, or theory has been subject to peer review and publications;
3) whether the known or potential rate of error of the technique or theory when applied is acceptable; and
4) whether technique, method, or theory has been generally accepted in the scientific community.

509 U.S. 579, 594-95 (1993). In *Kumho Tire Co.*, the Supreme Court held that the *Daubert* factors applied not only to expert testimony based on scientific knowledge, but also to expert testimony based on general principles, technical knowledge, and other specialized knowledge. 526 U.S. 137, 141 (1999). Nonetheless, the trial court's "gatekeeping" function "'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *McCorvey*, 298 F.3d at 1257) (emphasis supplied).

In *U.S. v. Frazier*, the Eleventh Circuit addressed the admissibility of expert testimony based on experience and held:

> The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed.R.Evid. 702 advisory committee's note (2000 amends.). Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability . . . [O]ur caselaw plainly establishes that one may be considered an

> expert but still offer unreliable testimony." 326 F.3d at 1341-42. . . . Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, **"[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.** The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed.R.Evid.702 advisory committee's note (2000 amends.)

387 F.3d at 1261 (emphasis added). Thus, before admitting the opinion of an expert, the trial court is required to ensure that the expert's opinion, even if formed based on considerable experience and expertise, is supported by more than the expert's word and that there are "good grounds based on what is known." *See Daubert*, 509 U.S. at 590. Moreover, "[t]he *Daubert* requirement that the expert testify to scientific knowledge -- conclusions supported by good grounds for every step in the analysis – means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d 1233, 1245 (11th Cir. 2005); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").

Other courts have discussed the "limited" nature of the "gate-keeping" function. For instance, the Northern District of California stated the following:

> Although trial judges enjoy broad discretion when determining the reliability of expert testimony, the "gatekeeper" function is limited. In determining the evidentiary reliability, the trial judge is limited to considering the methodologies relied upon by the expert, not the conclusions reached by the expert. *U.S. v. Bonds*, 12 F.3d 540, 563 (6th Cir.1993) (quoting *U.S. v. Brown*, 557 F.2d 541, 556 (6th Cir.1977)). It is not the trial court's role to determine whether the expert's conclusions are actually correct. 4-702 Weinstein's Federal Evidence § 702.05. The certainty of the scientific results are matters of weight for the jury. "[A] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *Maiz v. Virani*, 253 F.3d 641, 666 (citations omitted). As well, the district court is not "to make ultimate conclusions

> as to the persuasiveness of the proffered evidence...," *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003), nor is it to "transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). Its sole purpose is to determine the reliability of a particular expert opinion through a preliminary assessment of the methodologies underlying the opinion. *Daubert*, 509 U.S. at 592-93.
>
> However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 147, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). A trial court may exclude evidence when it finds that "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

*DSU Medical Corp. v. JMS, Co.*, Ltd., 296 F.Supp. 2d 1140, 1147 (N.D. Cal. 2003). Thus, the court is not permitted to exclude an expert report simply because it does not agree with the conclusions reached by the expert. Rather, that is a question for the trier of fact. Federal Rule of Evidence 705 provides for the disclosure of facts underlying an expert's opinion and states the following:

> The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination. Moreover, incorrect factual bases that form an expert's opinion can be challenged on cross-examination.

Fed. R. Evid. 705. However, it is an abuse of discretion to allow expert testimony which lacks factual support in the record. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002). Moreover, expert witnesses that are not qualified as a *legal* expert are permitted from expressing legal opinions. *See, e.g., Geico Cas. Co. v. Beauford*, Case No. 8:05-cv-697-T-24EAJ, 2007 WL 2412974, *3 (M.D. Fla. Aug. 21, 2007). With respect to hearsay, Rule 703 permits expert reports to contain hearsay or other inadmissible evidence, which the expert relies on to be admitted to explain the basis of the expert's report. *Briscoe v. White*, Case No. 2:03-cv-

154-FtM-29SPC, 2004 WL 5488228, *3 (M.D. Fla. May 24, 2004). "To the extent the reports contain inadmissible hearsay, such inadmissible hearsay will not be admitted for the truth of the matter asserted." *U.S. v. Great Lakes Dredge & Dock Co.*, Case No. 97-2510-CIV, 1999 WL 1293469, * 3 (S.D. Fla. July 28, 1999).

## III. <u>ANALYSIS</u>

### A. Plaintiffs' Expert Witnesses

#### 1. <u>Coleman</u>

Coleman was retained by Plaintiffs to provide expert coding and billing opinions with an emphasis in the coding and billing practices of PICC. Coleman has an extensive expert analysis background and is no doubt competent based upon her knowledge and experience to testify as an expert witness. As the Defendants point out, CPT coding is the proper subject of expert testimony. *U.S. v. Diaz*, Case No. 07-20398-CR 2008 WL 906725 (S.D. Fla. Mar. 28, 2008). In *Diaz*, the defendants were charged with submitting fraudulent claims, and the government retained a nurse practitioner to review claim packets and render an expert opinion as to whether the fraud indicators were present. *Id.* The defendants sought to exclude her as an expert witness, and the court denied their request noting "billing codes . . . [are] beyond the knowledge of an ordinary juror." *Id.* at *6. Thus, the court found that the expert's testimony would be helpful to the jury. *Id.*; *see also Maharaj*, 2007 WL 2254559 at *8. This Court agrees with the analysis set forth in *Diaz* and holds that expert testimony is appropriate for CPT coding. However, as stated in *Diaz*: "Expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person . . . Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."

*Id.* (quoting *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004)). Thus, neither Coleman nor any other expert witness will be permitted to assert statements that amount to legal conclusions. Otherwise, Defendants' and Intervenors' Motions as to Coleman are **DENIED**.[5]

2. McClave's Report

McClave was retained by Plaintiffs to review and form an expert opinion regarding Ratcliff's statistical sample. McClave's report makes clear that he is a reliable expert with an extensive background in statistical analyses. Moreover, he concluded that Ratcliff "followed the basic requirements to be considered a statistically reliable probability sample." Doc. No. 402-2 at 5. Defendants seek to exclude his expert report and testimony because they argue that Ratcliff generated an inadequate sample.

At this juncture, the Court is not certain as to the relevancy of McClave's report. As previously stated, Plaintiffs no longer list Ratcliff as an expert witness. Thus, McClave's report appears to be moot because Ratcliff's sample is not longer at issue in this case. However, the Court reserves such determination for trial. Accordingly, Defendants' and Intervenors' Motions as to McClave are **DENIED.**

3. Root's Report

Root was retained by Plaintiffs to provide expert opinions and analysis concerning their claims of fraud, over-utilization and other matters. Root has been a specialist in the medical field for over 21 years. Approximately twenty percent (20%) of Root's patients suffer neck or back strains or sprains, and less than ten percent (10%) of those patients suffer the injuries from an

---

[5] Defendants state that Coleman should be precluded from referencing the "coder's mantra" which states "if it is not documented, it did not happen" and that she should be precluded from using the phrase "billing for services not rendered". However, these arguments were previously addressed in Defendants' motions in Limine.

automobile accident. Root contends that whether the injuries result from a motor vehicle accident is not of significant consequence to the injury itself.

Plaintiffs argue that Root does not qualify as an expert because he is not licensed in Florida. However, this Court does not find that bears any significance on his ability to provide an informed opinion as to PICC's medical treatment protocol. Nonetheless, as mentioned above, no expert witness will be allowed to offer testimony that amounts to a legal conclusion. Additionally, this Court has already addressed whether the opinions of Plaintiffs' experts are based on an adequate statistical sample. The Court finds that Root is an experienced and potentially helpful expert witness. Accordingly, Defendants' and Intervenors' Motions as to Root are **DENIED**.

4. <u>Konsens' Report</u>

Konsen has been a board certified orthopedic surgeon and was retained by Plaintiffs as an expert witness predominately on PICC's medical record keeping. As set forth above, Konsens has an extensive medical background, particularly in the area of neck and back sprains or strains, including those that result from automobile accidents. Konsens has also published a number of articles in the medical field. Accordingly, the Court finds that Konsens maintains the requisite expertise and knowledge to act as an expert witness. Furthermore, because Konsens mainly addresses PICC's record keeping practice, his expert testimony is not duplicative of Root's report. Finally, expert testimony is appropriate regarding the adequacy of medical record keeping. *See, e.g., U.S. v. Bek*, 493 F.3d 790, 799 (7th Cir. 2007). Accordingly, Defendants' and Intervenors' Motions as to Konsens are **DENIED**.

**B. Defendants' Expert Witnesses**

1. Atchison's Report

Atchison is a board certified specialist PM&R and has been practicing in academic medical centers for the past 17 years. He is qualified as an expert specific to his medical background. The Court notes that Atchison appears to address several matters. More specifically, he: 1) vouches for the accuracy of certain factual representations made to him by the Defendants about their business practices;[6] 2) offers an opinion based on the five files Defendants provided him; 3) offers opinions as to reasonable and customary practices in the industry; 4) offers an opinion as to Root's report regarding all of the claims at issue in this case;[7] and 5) offers an opinion about the practice of the Defendants as represented to him by the Defendants.[8]

Atchison will be prohibited from vouching for underlying facts as to which he lacks personal knowledge. *Id.*[9] The Court notes that Atchison's report appears to address facts he assumes to be true or that have been represented to him as true. The Defendants have the burden of establishing facts as true before Atchison may rely on them as evidence. Plaintiffs maintain that Atchison's review of five charts "is far too slender a reed to support the broad conclusions to which Dr. Atchison anticipates testifying." Doc. No. 398. The Court agrees that a review of only

---

[6] For instance, Atchison states: "After reviewing the PICC charts [] and discussing the office protocols with Dr. Colvin, it is apparent that a thorough history and physical examination is performed on the first visit . . ." Doc. No. 398-2 at 16. Atchison also states: "the standardized treatment protocol is their attempt to synthesize and combine the results of the medical research into a useful clinical regimen." Doc. No. 398-2 at 19.

[7] For example, "it is apparent that the office attempts to acquire all medical information regarding each patient . . ." Doc. No. 398-2 at 8-9 (emphasis added). Also, he states: "It is clearly stated in the physician notes the exact treatment every patient received at each visit . . ." *Id.* at 11 (emphasis added).

[8] Atchison testified at the deposition that it is his opinion Dr. Colvin has rendered individualized treatment to the patients who are at issue in this lawsuit. Doc. No. 398-3 at 6.

five charts which were selected by Defendants provides insufficient factual basis to formulate a reliable opinion as to all the treatment and claims at issue in this case. *Stecyk*, 295 F.3d at 414; Fed. R. Evid. 702. To the extent Atchison is relying on the five files and forming opinions as to *all claims* at issue in this case, he lacks the requisite factual foundation to do so. However, it is premature to determine whether the Defendants will be able to offer a proper factual predicate to support Atchison's opinions. Accordingly, Plaintiffs' Motion as to Atchison is **GRANTED in part** and **DENIED in part**. Atchison will not be permitted to vouch for the underlying facts for which he lacks personal knowledge.

2. Sennetti

As represented above, Sennetti is qualified as an expert with respect to statistics and auditing. Plaintiffs maintain that Sennetti's report and expert testimony should be excluded as irrelevant because he only reviewed Coleman's original report and did not review her supplemental report. Plaintiffs also state that Sennetti has never testified as an expert before a federal or state court. As previously mentioned, this Court's "gatekeeping" function requires an analysis' of the *foundations* of the expert opinions. *Frazier,* 387 F.3d at 1260; *McCorvey*, 298 F.3d at 1257. With that said, the basis of Sennetti's expert opinion relies on an incomplete report, which has since been updated to purportedly reflect the entire State Farm insured population that was treated at PICC. Moreover, it is evident that Coleman's supplemental report may alter the opinions expressed by Sennetti considering he took issue with her report because she had not reviewed the files of all State Farm insureds treated by PICC, or at least a sufficient representative population. Doc. No. 400-3 at 12.

---

[9] With respect to Plaintiffs' hearsay argument, the Court does not agree that because Atchison met and conferred with Dr. Colvin and Robert Colvin, his expert testimony and report constitutes hearsay. Plaintiffs do not offer any

The Defendants argue that Sennetti should be allowed to testify as an expert because Coleman's supplemental report did not cover all State Farm insureds at issue in this litigation. However, this argument is not convincing. Whether Coleman's supplemental report covered the entire population as opposed to the majority of the population has no bearing on the relevancy of Sennetti's expert opinion as to her initial report. The Court allowed Plaintiffs to supplement Coleman's report, and Sennetti's expert does not encompass that supplemental report. Accordingly, Plaintiffs' Motion is granted in part and denied in part. Sennetti is prohibited from offering any expert testimony as to the supplemental report. Otherwise, Plaintiffs' Motion is **DENIED**.

3. Weatherford

Weatherford was retained by Defendants solely to provide an expert opinion as to Coleman's expert report, and he has an extensive coding background. Doc. No. 400-2 at 3. Weatherford founded his opinions on articles and treatises grounding in coding guidelines and Plaintiffs have not disputed that those sources are authoritative. He provided a list of three statistical and auditing references that he used in formulating his opinion. *Id.* Weatherford concluded that Coleman's report is not supported by scientific or auditing evidence. *Id.* at 8. Plaintiffs highlight Weatherford's testimony that he has not completely digested Florida's No Fault Law and he really focused his attention on Coleman's report. Doc. No. 400-3 at 17-8. However, Weatherford was retained as an expert for Coleman's report and not on Florida's No Fault Law.[10] Thus, it appears Florida's No Fault Law is outside the scope of his engagement.

---

case law specific to these facts regarding impermissible expert testimony as hearsay.

[10] Plaintiffs attempt to challenge Weatherford's competence because he has not spoken with Dr. Colvin or Robert Colvin. *Id.* at 19. Interestingly, with respect to Atchison, Plaintiffs have argued reliance on any such conversations would be improper and constitute objectionable hearsay. Doc. No. 398.

Plaintiffs also take issue with Weatherford's testimony that there are no guidelines for reviewing another CPT coder's work and that he relied solely on his experience. *Id.* at 23. Weatherford indicated that there may be more than one appropriate method of reviewing a medical provider's bills and documentation. *Id.* at 25. Finally, Weatherford testified that he would not be able to comment upon whether or not a coder's evaluation was appropriate without seeing the medical records. *Id.* at 29.

The Court has reviewed the arguments raised by the Plaintiffs. However, the Court is more troubled by Weatherford's report because, as Plaintiffs mention, it appears to be more of an attack on Coleman's credibility as an expert rather than a challenge to the methodologies she utilized in forming her opinion. As set forth above, Weatherford's report includes a number of derogatory statements concerning Coleman's credibility, which is not appropriate under *Daubert*. *See supra* at 9-11. An expert can criticize the methodology of another expert, but it is not appropriate for the expert to attack the opposing expert's credibility. *See Gray v. Florida,* Case No. 3:06-cv-990-J-20MCR 2007 WL 2225815, *3 (M.D. Fla. July 31, 2007); *United States v. Falcon et al.*, 245 F.Supp. 2d 1239, 1245 (S.D. Fla. 2003). To the extent Weatherford provides an expert opinion as to the available and appropriate methodologies to be utilized for CPT coding, his expert opinion will be allowed as proper under *Daubert*. However, credibility is an issue of fact for the jury and Weatherford will not be permitted to offer an opinion regarding the credibility of other witnesses. Accordingly, Plaintiffs' Motion is **GRANTED in part and DENIED in part** as to Weatherford.

## IV. CONCLUSION

The evidence presented makes it clear that each expert witness is qualified to testify as an expert in his or her limited area(s) of expertise. To the extent the experts offer testimony which is outside their respective expertise, the testimony will not be allowed. Furthermore, none of the experts discussed herein are qualified as *legal* experts. Thus, testimony which amounts to a legal opinion or conclusion will not be permitted.

For the foregoing reasons, **IT IS ORDERED**:

1. Plaintiffs' Motion to Exclude Opinion Testimony of James Atchison, D.O. and Supporting Memorandum (Doc. No. 398) **GRANTED in part and DENIED in part**;
2. Plaintiffs' Motion to Exclude the Opinion Testimony of Robert Weatherford and John Sennetti and Supporting Memorandum (Doc. No. 400) is **GRANTED in part and DENIED in part**;
3. Defendants' Motion to Exclude/Strike Report and Expert Opinion of James T. McClave (Doc. No. 402) is **DENIED**;
4. Defendants' Motion to Exclude/Strike Report and Expert Testimony of Connie G. Coleman (Doc. No. 404) is **DENIED**;
5. Intervenors' Motion to Strike Report and Preclude Expert Testimony of Connie G. Coleman and Memorandum of Law in Support (Doc. No. 407) is **DENIED**;
6. Defendants' Motion to Exclude/Strike Report and Expert Testimony of Barry Root, M.D. (Doc. No. 405) is **DENIED**;
7. Defendants' Motion to Exclude/Strike Reports and Expert Testimony of Richard M. Konsens, M.D. (Doc. No. 406) is **DENIED**; and

8. Intervenors' Motions to Strike Report and Preclude Expert Testimony of Dana Kaufman, James McClave, Darrell Spell, Barry Root and Richard Konsens (Doc. No. 408) is **DENIED**.

**DONE and ORDERED** in Orlando, Florida on January 9, 2009.

GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE